(173 App. Div. 663)

CHACE TRUCKING CO. v. RICHMOND LIGHT & R. CO.

(Supreme Court, Appellate Division, First Department. July 10, 1916.)

1. STREET RAILROADS ☞28(1)—OBLIGATION TO RAISE WIRES.
    A street railroad is not obliged to raise, for the safe passage of a truck carrying a high load, its wires rightfully strung at a proper height.
    [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 39–41, 64; Dec. Dig. ☞28(1).]

2. ELECTRICITY ☞19(5)—INJURIES—TRUCK WITH HIGH LOAD COLLIDING WITH WIRES.
    In action for injuries from truck carrying a pile driver coming in contact with trolley wires, evidence that defendant company, pursuant to notice, had its wrecking crew on hand to lend what aid and protection it could to the truck as it passed along a street where trolley wires were strung, but with the purpose primarily to see that the truck did not interfere with or injure the wires, and that those in charge of the truck were careless and negligent in selecting a route, and in driving too near to the wires with their high load, after warning, *held* to require reversal of verdict for plaintiff.
    [Ed. Note.—For other cases, see Electricity, Cent. Dig. § 11; Dec. Dig. ☞19(5).]

Appeal from Trial Term, New York County.

Action by the Chace Trucking Company against the Richmond Light & Railroad Company. From ' a judgment entered on. ver-

dict, and from an order denying motion for new trial, defendant appeals. Judgment and order reversed, and complaint dismissed.

Argued before CLARKE, P. J., and McLAUGHLIN, SCOTT, DOWLING, and DAVIS, JJ.

Guy O. Walser, of New Brighton, for appellant.

Joseph G. Abramson, of New York City (Henry Waldman, of New York City, of counsel), for respondent.

DAVIS, J. The plaintiff recovered a judgment for $778.81 damages for the loss of four horses. Plaintiff was in the trucking business, and was engaged in moving a certain pile driver from a pier at Clifton, S. I., to the works of the New York & Richmond Gas Company, at Stapleton, on February 23, 1909. For this purpose the plaintiff used 2 trucks and 16 horses. The route followed in moving this pile driver was partly along Canal street to its intersection with Bay street, and thence along Bay street to the place of the accident. The defendant at that time was operating a two-track trolley line with overhead wires on Bay street. The feed wires with which the trolley car poles make connection are supported in position by span wires, which in turn are attached to wooden poles at the side of the street. The feed wires are insulated from the span wires, and the span wires carry an insulator before reaching the pole. Owing to the weight and tension of the wires, there is a sag near the feed wires over the center of the street, and thus there is a greater overhead clearance at the side of the street than in the middle.

On the day in question the truck carrying the pile driver was in charge of the plaintiff's own employés. As the truck proceeded along its route the defendant's employés followed with it, accompanied by its emergency tower wagon. The overhead feed wires are strung over the center of the street. The top of the pile driver as it lay upon the truck was 16 feet 2 inches from the street surface. While on Bay street, near Vanderbilt avenue, the pile driver came in contact with the defendant's electric feed wire, with the result that the electric current passed through the bodies of 4 of plaintiff's horses which were hauling the pile driver, killing them, and injuring 4 other horses, and to recover this damage this action was brought.

Andrew Hazelgreen, for the plaintiff, testified that he was foreman of the plaintiff, and had charge of the men and horses engaged in transporting this pile driver; that he had 16 horses in all attached to the truck, with five men aiding him; that they drove along until they reached Bay street; that they were accompanied by the wrecking wagon of the Richmond Light & Power Company; that the men in charge of the wrecking wagon said that they were there to protect the plaintiff and to take care of the wires, and that he told the witness to keep to the right all the way down; that the wrecking wagon was right alongside plaintiff's truck; that as they arrived at or near the trolley wires the wrecking crew raised the wires for them to pass under, the foreman of the wrecking crew telling them to go ahead and keep to the right, that everything was all right; that they then proceeded to Bay street, on an upgrade, and got to a point where there was a big tree, with branches stretching out to the center wire; at

the top of the hill they stopped, and there was a bend in the road there; that at this point the foreman of the wrecking wagon said that everything was all right if they would keep to the right. This witness then stated as follows:

"I said: 'Now, this is going to turn around, either one end or the other, and strike this wire just as sure as you live when we are going down that hill.' He said: 'No, it ain't. We are here. We will raise the wire up for you.'"

The witness further testified that at that point a clearance from the ground to the wire of about 15 feet was needed, and the clearance looked to him to be 15 feet. When the foreman told him that he was there and would raise the wires, the witness said: "Well, wait a minute. I will have to think over it." The foreman said: "Everything is all right; go ahead." The witness then testified that they used a little judgment before starting and consulted with one another, and the wrecking crew told them to go ahead, that they were there and would protect them; that they started off, keeping to the right, and went right into the tree; that after going about 15 feet the horses commenced to stumble; they went down one after another; there were flashes, hair burning, and thereupon the wrecking crew came over and raised the wire up; that there was a curve right at the point where the accident happened. The witness said he did not know the distance between the trolley wires and the street, although the top of the pile driver was 16 feet 2 inches from the ground, and that he told the foreman of the wrecking crew that such was the distance. On cross-examination the witness said that after the accident the forward wheel was near the trolley track and that the left rear wheel was 4 feet from the track; that the right wheel was about 3 feet away from the curb and that the front right wheel was 6 feet from the curb; the witness did not see the trolley wire come in contact with the derrick at any place; that the team swung to the left in order to get away from the curb, and that this happened at the moment of contact. The witness testified that the space between the curb and the nearest track was 10 or 12 feet. He further said that the foreman of the wrecking crew said it was all right, go ahead, and that he (the witness) then called his drivers together and consulted them, but they passed no opinion about it. Then the witness was asked this question:

"Q. They did not say anything? A. They did not think it right for to go ahead under there."

The witness further said that he did not know anything about wires, and did not know that, if the truck came in contact with the feed wire, there would be trouble. Then he changed this answer, and said that he knew there would be trouble in that case. On redirect examination the witness said that the truck had to swing out from the curb to get away from the curb and the tree, on account of the branches.

William Nelson, for the plaintiff, stated that he was a teamster, and helped in driving the plaintiff's truck at the time of the accident, and that they got orders to go ahead when they were on top of the

hill at Bay street, the foreman of the defendant telling him to keep to the right, and that on account of the tree they had to swing the horses into the car track; that they could not be driven without swinging over to the car track on account of the bend in the road; that they went about 15 feet, and then the horses fell down. At this time one of the rear wheels of the truck was on the car track and the right-hand rear wheel was about 4 feet from the curb, and the truck was cater-cornered across the road.

Hugh Perry, for the plaintiff, testified that he was a driver working on the truck on the day of the accident and was seated on top. At the top of the hill on Bay street they came to a halt. He got word from the man in charge of the truck that everything was all right, and they started down the hill near the curb. There was a tree there whose branches extended part of the way into the roadway as far as the wires. In order to clear it the truck had to swing out toward the tracks a little bit; that in turning the curb he swung his horses partly in the track and straddled his wagon part way until he got around the bend. He was driving 8 horses at this time. He testified, also, that at the time of the accident one forward wheel was on the track and the other was astraddle of the two tracks on the left-hand side, and the top of the pile driver was almost even with the center wire between the tracks.

Walter Fisher, another driver, testified that he was driving the truck which was in the rear, which truck was used as a sort of anchor going downgrade, and his truck was attached to the back of the other truck; that they went about 15 feet, and all the horses fell down, and he saw a flash of lightning on the derrick, and at that time the derrick was in the track just after making the turn; that they swung the truck out to clear the branches of a tree. At the time of the accident the front wheels of the forward truck were in the track, and the hind wheels also. His truck was just behind, with two wheels in the track.

Patrick Riley testified, for the defendant, that he was in charge of the emergency crew of the defendant on the day in question; that he was present to look after the wires and see that the plaintiff did no damage to them; that he saw there a Mr. Crawford, superintendent for the Raymond Construction Company, the owner of the pile driver. Crawford told him the direction the truck was to take. When the witness first saw the truck, it had not yet reached Bay street. Before the truck got on Bay street, the wires were raised so that the truck could get to the right-hand side of the street. When the horses got on Bay street, the truck went up on a fast walk or run, with the men alongside it, and the tower wagon was behind them. The witness testified that he warned the drivers to keep to the right at the top of the hill on Bay street. The truck stopped when it reached the hill, and they fastened another truck behind the one with the derrick; that he told the foreman of the plaintiff that the wires were not high enough for the thing to go by, and he would have to keep to the right. There was plenty of clearance at the right. At the point of the accident the rear end of the derrick at the top came in contact with the

wire. On cross-examination Riley said that he was instructed to go down to the place and take care of the trolley wires, to protect them against damage to them by the truck. The witness said that he told the plaintiff's people that the wires were not high enough, and that there was another route which they should take, and that if they would give him about 2 or 2½ hours he would raise the wires out of the way, so that they could get by without danger; that they were in a hurry and would not wait; that he told the foreman in charge of the truck the amount of clearance, and that the truck would not pass under the wire; that they would have to keep to the right, away from the wire, if they expected to get through. As they went up Bay street, the witness went along with them with the tower wagon, telling plaintiff's driver to keep to the right or there would be danger; that he did not raise the wires at this point, because they would not wait for him to raise them.

Daniel Stoddard testified that he was in the employ of defendant, and was present at the time of the accident; that when the truck stopped at the top of the hill it was between the rail and the curb on the right-hand side; that there was 15 to 18 feet space there; that the top of the pile driver on the truck extended higher than the trolley wire; that the truck could not be driven in the track without touching the trolley wire; that the drivers were instructed a dozen times to keep to the right. On cross-examination he said they kept to the right until they got going down the hill, when they did not keep to the right, because the truck was going too fast and they could not hold it back. They pulled their lead teams out. They went down the hill about 150 feet, and then the accident occurred.

Calvin O'Brien also testified that he was a member of defendant's emergency crew on the day in question, and at the time of the accident the rear end of the pile driver touched the trolley wire; this end was the highest point of the whole outfit; that as they were going down hill he saw the wire come in contact when they started to swing out. He saw they were going to swing out and were going to hit the wire. He heard the drivers told that the wires were dangerous and they should keep out from under them.

[1, 2] Upon this evidence the plaintiff recovered a judgment, which we think should be reversed. There is no evidence whatever that the defendant undertook the responsibility of securing a safe passage for this truck through the street and under its wires. It was under no obligation to raise its wires so as to insure the safe passage of the truck. It is quite true that, pursuant to a notice that the truck was to pass, the defendant had its wrecking crew on hand to lend what aid it could, and to protect the truck so far as it could; but it is also clear that the primary purpose of their being there was to see that the truck did not interfere with or injure defendant's wires. Thus there is no evidence that the accident was caused through any negligence of the defendant. Its wires were rightfully strung over the street and they were not negligently maintained or operated. The evidence shows that the plaintiff's servants in charge of the truck were careless and negligent, both in selecting a route and in driving upon the route

as they did. Presumably they were men of intelligence, and could easily see and appreciate the danger of allowing the load on the truck to come in contact with a live trolley wire. They were constantly warned to keep to the right of the road, where the clearance was sufficient to enable them to pass without touching the wire; but, notwithstanding these warnings, in order to pass an exceedingly dangerous point in the road at the curve at the top of Bay street, they swung their horses and their truck onto the car track out of the roadway, so that the highest point of the derrick came in contact with the feed wire, and in this way the accident was caused. Obviously the accident was caused through the want of care on the part of plaintiff's servants in going around this curve. The evidence shows that they appreciated the danger, but notwithstanding this they went on. With the danger thus imminent and obvious, they were bound to stop rather than risk the danger by proceeding. Instead of doing this they took the risk, went on, and the accident happened—not through any fault of the defendant, but through their own fault.

Judgment and order reversed, with costs, and complaint dismissed, with costs. Order filed. All concur.